UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ABASS EL-HAGE, *on behalf of himself and
all others similarly situated*,

    Plaintiff,

v.

COMERICA BANK and ELAN
FINANCIAL SERVICES,

    Defendants.

Case No. 20-10294
Honorable Laurie J. Michelson

---

**OPINION AND ORDER GRANTING ELAN FINANCIAL'S MOTION
TO COMPEL ARBITRATION [11], GRANTING COMERICA'S REQUEST TO
COMPEL ARBITRATION AS A NONSIGNATORY [15], AND DISMISSING AS
MOOT COMERICA'S MOTION TO COMPEL ARBITRATION [13]**

---

Plaintiff Abass El-Hage alleges that Comerica Bank and its servicer Elan Financial Services enrolled customers in an overdraft protection program without their consent in order to charge higher fees and interest rates. El-Hage filed this putative class action, seeking damages and injunctive relief for violation of the Michigan Consumer Protection Act, breach of contract, and unjust enrichment.

Comerica and Elan Financial now move to dismiss the complaint and compel arbitration pursuant to the terms of their agreements with El-Hage. For the reasons that follow, the Court will grant that request.

## I. Background

El-Hage opened a checking account with Comerica in 2007 and then a Visa Platinum credit card in 2017. (ECF No. 1, PageID.2.) Elan Financial was the servicer for the credit card. (*Id.* at PageID.4.) Comerica and Elan Financial provided an overdraft protection service that advanced

funds from a customer's credit card to cover any overdraft in their checking account. (*Id.*) El-Hage alleges that when he opened the credit card, his Cardmember Agreement stated that overdraft protection must be "specifically requested," but he was enrolled despite never requesting the service. (*Id.* at PageID.5; ECF No. 1-1, PageID.20.)

El-Hage further alleges that the overdraft protection is not protective at all. Instead, the service subjects customers to an overdraft protection fee of $8.00 to $16.00, an overdraft protection transfer fee of $10.00, and a heightened interest rate of 25.24% on the advanced amount. (*Id.* at PageID.5, 15.) (The interest rate on the card is otherwise 21.24%. (*Id.* at PageID.5 n.4.)) Additionally, El-Hage alleges, the overdraft protection service rounds up to the nearest $100 to transfer funds. (*Id.* at PageID.6.) So if a customer overdrafts their checking account by just one dollar, the overdraft protection service will transfer $100 from the credit card to the checking account, resulting in $99 charged to the credit card at the heightened interest rate, plus fees. (*Id.*)

On top of this, El-Hage alleges, Defendants automatically enroll customers to pay their monthly credit card bill with their associated checking account. (*Id.* at PageID.6.) This creates an expensive cycle, by which a customer's one-time overdraft of their checking account may trigger an overdraft transfer from the credit card, rounded up to the nearest $100, a credit card bill for that overdraft, and automatic payment through the checking account, which may cause a new overdraft and restart the entire process, with potentially greater and greater amounts overdrafted, advanced, and repaid. (*Id.* at PageID.6–7.) Comerica and Elan Financial collect the profits from this "fabricated debt." (*Id.* at PageID.7.)

This arrangement proved particularly unfortunate for El-Hage. While he was in Egypt for a month from December 2017 to January 2018, Comerica and Elan transferred $6,000 in overdraft protection advances, charged nine overdraft protection transfer fees, and charged $83.17 in

interest. (*Id.* at PageID.7.) The following month, in January 2018, automatic payment of a $500 minimum balance on his credit card caused an overdraft of his checking account. (*Id.* at PageID.7.) In response, the overdraft protection service transferred $1,000.00 to his checking account, resulting in a $1,000.00 charge on his credit card at the heightened interest rate, plus fees. (*Id.*). El-Hage alleges that all of these transfers and charges were made automatically, without contacting him to provide notice or an opportunity to avoid the charges. (*Id.*).

El-Hage brings suit against Comerica and Elan Financial on behalf of himself and all similarly situated persons under Federal Rule of Civil Procedure 23, asserting violation of the Michigan Consumer Protection Act, Michigan Compiled Laws § 445.901, *et seq.* (MCPA), breach of contract, and, in the alternative, unjust enrichment. (*Id.* at PageID.12–17). He seeks certification of a Michigan class for the Michigan Consumer Protection Act claim and certification of a nationwide class for the breach of contract and unjust enrichment claims.

Elan Financial and Comerica each filed a motion to dismiss and compel arbitration. (ECF No. 11, 13.)

## II.  Legal Standards

The Federal Arbitration Act ("FAA") "expresses a strong public policy favoring arbitration in a broad range of disputes." *Cooper v. MRM, Inc.*, 367 F.3d 493, 498 (6th Cir. 2004). It provides that agreements to arbitrate "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. If a valid arbitration agreement governs a claim, courts must compel arbitration. *Id.* §§ 3–4. "[A]n enforceable contractual right to compel arbitration operates as a quasi-jurisdictional bar to a plaintiff's claims, providing grounds for dismissal of the suit." *Johnson Associates Corp. v. HL Operating Corp.*, 680 F.3d 713, 718 (6th Cir. 2012).

"If parties contract to resolve their disputes in arbitration rather than in the courts, a party may not renege on that contract absent the most extreme circumstances." *Stout v. J.D. Byrider*, 228 F.3d 709, 715 (6th Cir. 2000). The burden is on the party opposing arbitration to show that the agreement is not enforceable. *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000).

"Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Sec., Inc.*, 315 F.3d 619, 624 (6th Cir. 2003); *see also Stout*, 228 F.3d at 714. In determining whether parties agreed to arbitrate, courts "should apply ordinary state-law principles that govern the formation of contracts." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); *see also Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 972 (6th Cir. 2007). Courts also look to state law to determine whether contract defenses may invalidate arbitration agreements. *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). "Any arguments based on the applicability of the FAA to the agreement at issue are, of course, evaluated in accordance with federal case law." *Seawright*, 507 F.3d at 972.

A party's failure to pursue arbitration in spite of a compulsory arbitration provision means that the party has failed to state a claim under Rule 12(b)(6). *Teamsters Local Union 480 v. United Parcel Serv., Inc.*, 748 F.3d 281, 286 (6th Cir. 2014).

### III. The Motions to Compel Arbitration

Elan Financial and Comerica filed separate motions to dismiss and compel arbitration; each has a separate contractual relationship with El-Hage. Elan Financial seeks to rely on the Cardmember Agreement for Elan Financial Services Visa Accounts ("Cardmember Agreement") that El-Hage received with his credit card. (ECF No. 11.) Comerica seeks to rely on the Business

and Personal Deposit Account Contract with Comerica Bank ("Deposit Contract") that governs El-Hage's Comerica checking account. (ECF No. 13.) Both contracts contain an arbitration clause and class action waiver. Alternatively, both Elan Financial and Comerica believe that they may each compel arbitration as nonsignatories to each other's contract with El-Hage. (ECF No. 11, PageID.130 n.1; ECF No. 15.)

El Hage argues neither of these formed valid agreements to arbitrate.

### A. Elan Financial's Motion

When El-Hage opened his Visa Platinum credit card, Elan Financial mailed him a copy of the Comerica Bank Visa Platinum Card Agreement (the "Cardmember Agreement"). (ECF No. 11, PageID.124; ECF No. 11-1, PageID.137.) Both El-Hage and Elan Financial attach copies of the agreement to their pleadings. (ECF No. 1-1; ECF No. 11-2.) The two copies vary slightly, but they are not dated and the parties do not explain the two versions. None of the variations affect the parties' dispute—for example, both contain Ohio choice of law provisions. The Court believes the two versions of the Cardmember Agreement to be functionally identical for purposes of this matter. The Court cites to both versions for clarity in the record.

The Cardmember Agreement states that it "contain[s] the terms that will apply to your Comerica Bank Visa Platinum Card Account," and that the agreement "becomes effective as soon as you or someone authorized by you uses the Card or Account, but no later than 30 calendar days after we issue and you fail to return the Card." (ECF No. 1-1, PageID.20; ECF No. 11-2, PageID.141.) The agreement contains an arbitration provision and states that it shall be governed by federal law and Ohio law. (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.145.)

Elan Financial and El-Hage dispute whether they agreed to arbitrate and what choice of law applies to the question of contract formation. The Court begins with choice of law.

### 1.  Choice of Law

Elan Financial argues that Ohio law applies based on the terms of the Cardmember Agreement. El-Hage argues that Michigan law applies because Michigan has the most significant relationship to the transaction and the parties. Although the state law is substantially identical on most of the issues the parties dispute here, the Court will resolve the choice of law dispute rather than recite two state law standards for each of the six issues that El-Hage raises.

Before interpreting the contract to determine choice of law, the Court makes clear that under either Ohio or Michigan law, El-Hage assented to the Cardmember Contract when he used the card. As Elan Financial correctly argues, Ohio and Michigan law agree that a credit card issuer manifests an offer by transmitting the card and cardholder agreement, and the cardholder manifests acceptance by subsequently using the card. Under Ohio law, "credit card agreements are contracts whereby the issuance and use of a credit card creates a legally binding agreement." *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641, 647 (N.D. Ohio 2007) (quoting *Bank One, Columbus, N.A. v. Palmer*, 579 N.E.2d 284, 285 (Ohio 1989)). Accordingly, "[b]y simply using the card," a consumer "agree[s] to be bound by the Agreement and all its terms." *Id.* Even if El-Hage were correct that Michigan law applies here, that does not assist his argument because Michigan applies the same rule. *See* Mich. Comp. Laws § 445.862(a) ("A retail charge agreement shall be considered signed and accepted by the buyer . . . if the retail charge account is used by the buyer or another person authorized by the buyer."); *Unifund CCR Partners v. Riley*, No. 287599, 2010 WL 571829, at *5 (Mich. Ct. App. Feb. 18, 2010) ("Defendant can only be deemed to have accepted the terms of use if she or someone she authorized used the card."); *Fia Card Servs., N.A. v. Selim*, No. 286522, 2009 WL 5150328, at *1 (Mich. Ct. App. Dec. 29, 2009) (affirming that "assent to the arbitration provision was established by her use of the credit card" and confirming

arbitration award pursuant to arbitration provision in the credit card agreement). As El-Hage recounts throughout his complaint, he used his card. (ECF No. 1, PageID.7, 12.) Whether applying Ohio or Michigan law, El-Hage and Elan Financial formed a contract when El-Hage used the credit card.

The Court therefore turns to determine whether Ohio or Michigan law governs the contract that the parties entered. To evaluate choice of law in a diversity case, a federal court applies the substantive law of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496 (1941). Because this action was brought in federal court in Michigan, Michigan's choice of law rules apply. *Mill's Pride, Inc. v. Cont'l Ins. Co*., 300 F.3d 701, 704 (6th Cir. 2002). Michigan applies the Restatement (Second) to determine whether a choice of law provision in a contract is enforceable. *Chrysler Corp. v. Skyline Indus. Servs*., 528 N.W.2d 698 (Mich. 1995); *Mill's Pride*, 300 F.3d at 705. The Restatement provides: "The law of the state chosen by the parties to govern their contractual rights and duties will be applied" unless "(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice," or "(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue." Restatement (Second) of Conflict of Laws § 187(2) (1971).

The Cardmember Agreement expressly states that the arbitration provision "shall be governed by federal law, including the Federal Arbitration Act, and Ohio law." (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.145.) Accordingly, the parties' choice of Ohio law in the Cardmember Agreement applies unless one of these two exceptions apply. But they do not. Ohio has a substantial relationship to Elan Financial and the transaction because Elan is domiciled there through its parent company, U.S. Bank (*see* ECF No. 21, PageID.533–534). *See Wachovia Bank,*

*N.A. v. Schmidt*, 546 U.S. 303, 318 (2006) (for diversity jurisdiction purposes, a corporate bank's citizenship derives from its state of incorporation and principal place of business); *Cranmore v. Wells Fargo Bank, N.A*., 2017 U.S. Dist. LEXIS 229235, at \*4 (Mass. Dist. Ct. 2017) ("U.S. Bank is a national bank with a designated main office in Ohio, meaning that it is domiciled in Ohio."). And El-Hage has not explained how Ohio law "would be contrary to a fundamental policy of" Michigan or how the two states' laws might meaningfully differ. "In order for the chosen state's law to violate the fundamental policy of [the forum state], it must be shown that there are significant differences in the application of the law of the two states." *Banek Inc. v. Yogurt Ventures U.S.A., Inc*., 6 F.3d 357, 362 (6th Cir. 1993) (alteration in original) (quoting *Tele–Save Merchandising Co. v. Consumers Distrib. Co*., 814 F.2d 1120, 1122–23 (6th Cir. 1987)). El-Hage has not made that showing here. Because neither exception under § 187(2) of the Restatement applies, the Court applies the law of Ohio, as chosen by the parties by the terms of the Cardmember Agreement.

### 2.  The Agreement to Arbitrate

With choice of law settled, the Court considers whether a valid agreement to arbitrate exists between the parties. *Javitch*, 315 F.3d at 624; *Stout*, 228 F.3d at 714. As the party opposing arbitration, El-Hage has the burden to show that the agreement is not enforceable. *Green Tree*, 531 U.S. at 91–92. If a valid agreement exists, El-Hage does not dispute that his claims would fall within the substantive scope of that agreement. (*See* ECF No. 17.)

The Cardmember Agreement states in bold font: "This Agreement contains an arbitration provision (including a class action arbitration waiver). It is important that you read the entire Arbitration Provision section carefully." (ECF No. 1-1, PageID.20; ECF No. 11-2, PageID.141.) The arbitration provision states in relevant part, again in bold font, "You agree that either you or

we can choose to have binding arbitration resolve any claim, dispute or controversy between you and us that arises from or relates to this Agreement or the Account and credit issues thereunder . . . ." (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.144.) It continues, in bold and capital letters: "If arbitration is chosen . . . NEITHER YOU NOR WE WILL HAVE THE RIGHT TO LITIGATE A CLAIM IN COURT OR TO HAVE A JURY TRIAL ON A CLAIM," and "YOU WILL NOT HAVE THE RIGHT TO PARTICIPATE AS A REPRESENTATIVE OR MEMBER OF ANY CLASS OR CLAIMANTS." (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.145.)

Elan argues that El-Hage agreed to these terms by "use" of the card, as provided in the Cardmember Agreement. (ECF No. 11, PageID.128; *see* ECF No. 1-1, PageID.20; ECF No. 11-2, PageID.141.) Aside from claiming that there was no "meeting of minds," which the Court addressed above when it found that El-Hage assented to the contract by using the card, El-Hage argues that he never agreed to the arbitration provisions for five other reasons:  (1) the arbitration provision lacks adequate notice, (2) because the Cardmember Agreement allowed Elan to unilaterally modify the terms of the agreement, it is unenforceable, (3) the waiver of his substantive rights is unfair and unenforceable, (4) the Cardmember Agreement is an unenforceable contract of adhesion, and (5) arbitration through JAMS or AAA is too expensive. (ECF No. 17, PageID.351.) The Court addresses each of these remaining arguments.

### 1. Notice

El-Hage contends that "the arbitration provision does not provide adequate notice of waiver and is unenforceable." (ECF No. 17, PageID.351.) He "acknowledges receiving the Cardmember Agreement," but "does not recall receiving . . . the arbitration provision," which was "hidden in the middle of Elan's Cardmember Agreement." (*Id.* at 360–361.)

This argument is not persuasive. El-Hage acknowledges that he received the Cardmember Agreement with the credit card in the mail. (ECF No. 1, PageID.5; ECF No. 17, PageID.351.) The Cardmember Agreement gave unambiguous notice that it contained an arbitration provision. The second full paragraph of the Cardmember Agreement warned El-Hage in bold font that the agreement "contains an arbitration provision (including a class action arbitration waiver)" and that "[i]t is important that you read the entire Arbitration Provision section carefully." (ECF No. 1-1, PageID.20; ECF No. 11-2, PageID.141.) The arbitration provision itself appears a few pages later, in bold and capital letters. (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.145.) The arbitration provision would be noticeable from the most cursory glance at the Cardmember Agreement. "[I]t is axiomatic that 'a person of ordinary mind cannot be heard to say that he was misled into signing a paper which was different than what he intended, when he could have known the truth by merely looking when he signed.'" *Spectrum Networks, Inc. v. Plus Realty*, 878 N.E.2d 1122, 1125 (Ohio Ct. App. 2007) (quoting *McAdams v. McAdams*, 88 N.E. 542, 544 (Ohio 1909)). El-Hage had notice of the arbitration provision and he accepted its terms when he used the card.

### 2. Unilateral Modification

The Cardmember Agreement provides that "Account and Agreement terms are not guaranteed for any period of time; we may change the terms of your Agreement, including your APRs and fees, in accordance with applicable law and the terms of your Agreement. . . . We will give you notice of any such change in the manner required by law." (ECF No. 1-1, PageID.23; ECF No. 11-2, PageID.141.) (Elan's version of the agreement is slightly different: "We will give you notice of any such change in the manner required by *Ohio and federal* law." (ECF No. 11-2, PageID.141) (emphasis added).)

El-Hage argues that because this provision allows Elan Financial to change the terms of the agreement, consideration is illusory and the contract is not binding. (ECF No. 17, PageID.362.) But the correct rule is more narrow. Under Ohio law, "[a]n arbitration provision is enforceable if the right of modification is *limited by a notice or timing provision*." *Wolfe v. J.C. Penney Corp.*, 111 N.E.3d 126, 132 (Ohio Ct. App. 2018) (emphasis added) (finding notice sufficient for mutuality of agreement where the employment contract provided that "any such modification shall be in writing and delivered to you at least fourteen (14) days prior to the effective date of the modification."). This is because "a contract is illusory only when by its terms the promisor retains an unlimited right to determine the nature or extent of his performance." *Century 21 Am. Landmark, Inc. v. McIntyre*, 427 N.E.2d 534, 537 (Ohio Ct. App. 1980). Courts applying Ohio law have found notice periods of 14 and 30 days to be sufficient. *See, e.g.*, *Wolfe*, 111 N.E.3d at 132 (fourteen days in an employment contract); *Morrison v. Circuit City Stores*, 317 F.3d 646, 667–68 (6th Cir. 2003) (holding arbitration provision was enforceable where contract allowed employer to alter or terminate agreement on December 31 of each year with 30 days' notice to employees); *Jefferis v. Hallrich Inc.*, No. 1:18-CV-687, 2019 WL 3462590, at *4–5 (S.D. Ohio July 31, 2019) (collecting cases), *report and recommendation adopted*, No. 1:18CV687, 2019 WL 3975774, at *5 (S.D. Ohio Aug. 22, 2019) (holding that because employer's Dispute Resolution Plan "has notice and timing requirements that limit defendants' ability to amend or terminate the Plan, defendants' promise to arbitrate is not illusory and does not lack consideration.").

El-Hage does not address these cases. Instead, he relies on decisions from other states involving unilateral modification *without* a notice requirement. *See Smith v. Chrysler Fin. Corp.*, 101 F. Supp. 2d 534, 538–539 (E.D. Mich. 2000) (holding that under Michigan law, "if an employment agreement contains an arbitration provision that may be unilaterally changed by the

employer at any time in the employer's sole discretion, the arbitration provision is unenforceable for lack of mutuality of obligation"); *Day v. Fortune Hi-Tech Mktg., Inc*., No. CIV.A. 10-305-JBC, 2012 WL 4049479, at *2 (E.D. Ky. Sept. 13, 2012) (holding that under Kentucky law, an agreement to arbitrate was illusory and lacked consideration where the agreement allowed the defendant to alter its terms "at any time in its sole and absolute discretion" without "advance notice" for the contracting party to accept the new terms), *aff'd*, 536 F. App'x 600 (6th Cir. 2013). These cases are distinguishable for two reasons: they do not apply Ohio law, and Elan's Cardmember Agreement contains a notice provision for any changes to its terms. El-Hage cites one case that does apply Ohio law, but is again distinguishable for lack of a notice provision. *See Floss v. Ryan's Family Steak Houses, Inc*., 211 F.3d 306, 315 (6th Cir. 2000).

The Court notes that the Cardmember Agreement here does not provide a specific notice procedure or notice period; it simply provides that "We will give you notice of any such change in the manner required by law" or "in the manner required by Ohio and federal law." (ECF No. 1-1, PageID.23; ECF No. 11-2, PageID.141.) Although there is no specified notice period, there is a notice requirement that references Ohio's standard. And Ohio law would probably not permit, for example, a 24-hour notice period. So the provision is not illusory. Because Elan's right of modification is "limited by a notice or timing provision," the right is not "unlimited" and therefore the provision is enforceable. *See Wolfe*, 111 N.E.3d at 132; *Century 21*, 427 N.E.2d at 537. Elan's ability to modify the Cardmember Agreement does not render consideration illusory or invalidate the contract.

### 3. *Waiver of Substantive Rights*

El-Hage next argues that the arbitration agreement unfairly waives two substantive rights. In his view, the agreement waives his statutory rights to recover attorney's fees and waives his

12

right to bring a class action in response to an unfair trade practice under the Michigan Consumer Protection Act (MCPA). These unfair waivers, argues El-Hage, make the contract unenforceable. (ECF No. 17, PageID.364.)

To start, El-Hage has not shown that the arbitration provision bars recovery of attorney's fees. The parties disagree on this point, but neither provides supporting authority. From the text alone, it appears to the Court that the arbitration provision permits recovery of attorney's fees, if those fees are payable under applicable law: "If you prevail on your claim, we will pay your arbitration costs and fees, other than attorney, expert, and witness fees and expenses. We will also pay any fees or expenses that applicable law requires us to pay . . . consistent with the Federal Arbitration Act . . ." (ECF No. 1-1, PageID.24, ECF No. 11-2, PageID.145.) Elan argues that under these terms, attorney's fees are not part of the "arbitration costs and fess" that Elan pays to all cardmembers who prevail in arbitration, but Elan will pay "any fees or expenses that applicable law requires us to pay," including attorney's fees. (ECF No. 21, PageID.538.) That seems to be a fair reading of the agreement. *See, e.g.*, *Bay Shore Power Co. v. Oxbow Energy Sols.*, LLC, 969 F.3d 660, 666–667 (6th Cir. 2020) (applying Ohio law; adopting a reasonable construction of terms governing attorney's fees to harmonize the terms rather than render them contradictory and awarding attorney's fees following FAA arbitration). El-Hage has not provided a plausible theory of what the "applicable law" would be or what fees or expenses it might require Elan to pay if El-Hage prevails. Accordingly, El-Hage has not shown that he is barred from recovering attorney's fees under this agreement.

El-Hage argues that his rights to bring a class claim and collect attorney's fees are "substantive" rights under the MCPA that cannot be waived because abridgment of those rights would prevent him from bringing an MCPA claim at all; the cost of individual arbitration without

attorney's fees would be too great. (ECF No. 17, PageID.365–367.) This argument relies on two cases applying Michigan law. The first, *Rembert v. Ryan's Family Steak Houses, Inc*., held that agreements to arbitrate statutory employment discrimination claims are enforceable only if (1) the arbitration agreement does not waive substantive statutory rights and (2) the arbitration process is fair so that the litigant may effectively vindicate her statutory rights. 596 N.W.2d 208, 226 (Mich. Ct. App. 1999). This, of course, is not an employment dispute, but courts in the Eastern District of Michigan have considered the *Rembert* rule in the context of consumer contracts. El-Hage also relies on *Adler v. Dell, Inc*., which reasoned that "where the amount in dispute is so small that it becomes impractical to bring a claim in the first instance, the right to bring a class action becomes more akin to a substantive right than to a mere procedural right." 2008 U.S. Dist. LEXIS 104912, at *19, 2008 WL 5351042, at *7 (citing *Wong v. T-Mobile USA*, *Inc.*, No. 05-73922, 2006 U.S. Dist. LEXIS 49444, at *5, 2006 WL 2042512, at *5 (E.D. Mich. July 20, 2006)).

As an initial matter, El-Hage's reliance on Michigan law is misplaced. As discussed at the outset, Ohio law controls the interpretation of the Cardmember Agreement. And even if Michigan law somehow applies, neither *Rembert* nor *Adler* support El-Hage's ultimate position. In *Adler*, the court held that Texas rather than Michigan law applied to the question of arbitrability, and even if Michigan law did apply, the class action waiver in the arbitration provision did not amount to a waiver of the plaintiff's substantive right to pursue consumer fraud claims under the MCPA because the statute allowed him to recover actual damages or $250, whichever was greater, plus attorney's fees, *see* Mich. Comp. Law § 445.911(2), and the provided arbitral forum (the National Arbitration Forum) was recognized by courts as a fundamentally fair and affordable forum for consumer claims. 2008 U.S. Dist. LEXIS 104912, at *21–25. The court concluded that the plaintiff had failed to show the class action waiver stripped him of substantive rights or that the arbitration

14

procedures of the NAF would be unfair, and therefore he had not shown any loss of substantive rights. *Id.* at \*25. The same reasoning would apply here. El-Hage estimates his individual damages would be $825.12 (ECF No. 17, PageID.366; ECF No. 17-3, PageID.409), which is greater than the estimated damages in *Adler*, and he has not shown that he will be unable to recover attorney's fees. Moreover, it is not clear that El-Hage's argument would succeed on an alternative choice of law. The Supreme Court has held that where an arbitration provision includes a class action waiver, "the fact that it is not worth the expense involved in proving a statutory remedy does not constitute the elimination of the right to pursue that remedy." *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). El-Hage has not shown that he arbitration provision in the Cardmember Agreement waives any substantive statutory rights.

### 4. Contract of Adhesion

Next, El-Hage argues that the Cardmember Agreement is a procedurally unconscionable contract of adhesion because it was a form contract offered to him on a take-it-or-leave-it basis.

This argument is out of step with the modern law of consumer contracts. El-Hage's position would render invalid all credit card agreements mailed to new cardholders—essentially all credit card agreements. As noted above in Subsection (1), courts accept that "the issuance and use of a credit card creates a legally binding agreement . . . [b]y simply using the card." *Heiges*, 521 F. Supp. 2d at 647 (quoting *Bank One*, 579 N.E.2d at 285). And consumers like El-Hage are not without other options for obtaining a credit card if they don't like the terms being offered by Elan and Comerica. El-Hage offers one case applying Ohio law in support of his unconscionability argument, but that case actually cuts against his position here. *Stachurski* held that under Ohio law, the arbitration clause in a satellite television customer agreement was *not* procedurally unconscionable even though it was offered on a "take-it-or-leave-it" basis, in a standard form,

there was a large disparity in bargaining power, the consumers had no legal counsel, the arbitration clause was on the third page in small print but bold, capitalized letters, the service provider had the right to modify the agreement unilaterally, the television services were not a "modern day necessity" and the defendant was not the only service provider, and the customers offered no evidence that they were defrauded or coerced into the agreement. *Stachurski v. DirecTV, Inc*., 642 F. Supp. 2d 758, 765–70 (N.D. Ohio 2009). Precisely the same reasoning applies here. The Cardmember Agreement is not an unconscionable contract of adhesion.

### 5. *The Cost of Arbitration*

Finally, El-Hage argues that the arbitration provision is substantively unconscionable because its mandate to arbitrate with JAMS or AAA is cost prohibitive. Where "a party seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive, that party bears the burden of showing the likelihood of incurring such costs." *Nefores v. Branddirect Mktg., Inc*., 2004 WL 2260703, at *7 (Ohio Ct. App. 2004) (quoting *Green Tree Financial Corp. v. Randolph*, 531 U.S. 79, 92 (2001)). Mere "risk" that a plaintiff "will be saddled with prohibitive costs is too speculative to justify the invalidation of an arbitration agreement." *Green Tree*, 531 U.S. at 91. Ohio courts read *Green Tree* to consider whether arbitration costs are prohibitive on a case by case basis. *Eagle v. Fred Martin Motor Co*., 809 N.E.2d 1161, 1174 (Ohio Ct. App. 2004).

In at least two instances, the Ohio Court of Appeals has declined to enforce an arbitration provision that imposed an arbitral venue with substantial fees. In *Nefores*, the court found that arbitration would be prohibitively expensive and therefore substantively unconscionable where the National Arbitration Forum Code of Procedure imposed a filing fee of $75,000 to $100,000 for any claim seeking damages valued over $750, plus one percent of the excess over $75,000, and a

16

hearing fee of $2,500, plus $1000 for each additional hearing, and the plaintiff stated in her affidavit that she would have to forgo her claim if forced to pay that amount. 2004 WL 2260703, at *8–9. And in *Eagle*, the court found that the arbitration clause in a motor vehicle purchase agreement was substantively unconscionable under the same NAF fee scheme, which imposed a filing fee of $750, $75 for a single subpoena request, $150 for each discovery order, $100 for a continuance request, $2,500 for a document hearing, $1,500 for an initial participatory hearing session, and at least $1,250 to submit a post-hearing brief. 809 N.E.2d at 1176. Although the NAF rules allowed fee waivers for indigent plaintiffs, the court found that "such arbitration costs would serve to deter even low-income persons who do not qualify for indigent status." *Id.* at 1177. The Ohio Court of Appeals concluded that the costs of arbitration under the terms of the agreement, which would total between $4,000 and $6,000 on a conservative estimate, were unconscionable as applied to the plaintiff, who was a primary caregiver for one child and made approximately $20,000 per year. *Id.*

El-Hage submits that arbitration through AAA or JAMS would be burdensome in the same way. He submits examples of two AAA arbitrator's fee schedules, who charge $2,800 and $1,500 per day, respectively, and $350 or $250 per hour, respectively, for study. (ECF No. 17-4; ECF No. 17-5.) In an affidavit, El-Hage declares that "[a]fter speaking to my attorneys, it is my understanding that the particular arbitration Elan is trying to force me to go to is extraordinarily expensive and may . . . prevent me from being able to pursue my claims." (ECF No. 17-2, PageID.407.) He states that he does not have "the financial resources necessary" to "pay thousands of dollars up front." *Id.*

But El-Hage has not shown that the sample fee schedules are typical or explained the rules governing fees under AAA or JAMS arbitration. Even assuming that the sample fees were

precisely the fees he would face, the Cardmember Agreement provides that Elan will "advance" El-Hage's initial filing and hearing fees at his request. (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.145.) And the agreement provides that if El-Hage prevails on his claim, Elan will pay all "arbitration costs and fees, other than attorney, expert and witness fees and expenses," plus "any fees or expenses that applicable law requires us to pay." (ECF No. 1-1, PageID.24, ECF No. 11-2, PageID.145.) El-Hage is not required to pay thousands of dollars up front as feared in his affidavit. Because El-Hage has not provided evidence of likely fees in JAMS or AAA arbitration beyond two sample fee schedules, unaccompanied by explanation for why those samples might be representative for his case, his claim that arbitration under the agreement–as opposed to litigation in court–is likely to be cost prohibitive is speculative and not sufficient to show substantive unconscionability.

* * *

In sum, El-Hage assented to the terms of the Cardmember Agreement when he used the card, and none of his objections have shown that the agreement is invalid or unenforceable. The Court concludes that a valid agreement to arbitrate exists between El-Hage and Elan.

### 3.  The Dispute with Elan Is Arbitrable

The second question for arbitrability is whether the parties' dispute falls within the scope of their agreement to arbitrate. *Javitch*, 315 F.3d at 624; *Stout*, 228 F.3d at 714. El-Hage does not dispute this part of the test. (*See* ECF No. 17.) And the Court agrees that El-Hage's claims for violations the MCPA, breach of contract, and unjust enrichment arising from fees and payments charged to his credit card is within the scope of "any claim, dispute or controversy between you and us that arises from or relates to this Agreement or the Account and credit issues thereunder." (ECF No. 1-1, PageID.24; ECF No. 11-2, PageID.144.) The arbitration clause is undoubtedly

capable of an interpretation that covers the asserted dispute. *See Nestle Waters N. Am., Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007) (quoting *AT&T Techs., Inc. v. Commc'n Workers of Am.*, 475 U.S. 643, 650 (1986)) ("[A]ny doubts are to be resolved in favor of arbitration 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'"). The Court concludes that El-Hage's dispute with Elan falls within the scope of their agreement to arbitrate.

### 4. Remedy

Accordingly, because a valid agreement to arbitrate exists between the parties, and the parties' dispute falls within the substantive scope of that agreement, Elan is entitled to enforcement of the arbitration provision.

Dismissal without prejudice, rather than a stay pending arbitration, is proper "when all of the issues raised in the district court must be submitted to arbitration." *Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000) (citations omitted); *see also Andrews v. TD Ameritrade, Inc.*, 596 F. App'x 366, 372 (6th Cir. 2014) (citation omitted). The Court will therefore dismiss El-Hage's claims against Elan without prejudice and compel arbitration of those claims on an individual, non-class basis.

### B. Comerica's Motion

Comerica moves to compel individual arbitration of El-Hage's claims under the terms of the Comerica Deposit Contract governing El-Hage's checking account (ECF No. 13), or, in the alternative, as a nonsignatory to the Cardmember Agreement with Elan (ECF No. 15).[1] El-Hage and Comerica agree that Michigan law governs the Deposit Account Contract. El-Hage again does

---

[1] Comerica's filing at ECF No. 15, styled as a response in support of Elan Financial, is better viewed as a joinder to or concurrence in the relief requested in Elan's motion.

not dispute that the scope of the arbitration clause would cover the dispute at issue; he disputes only whether the parties formed a valid agreement to arbitrate. (*See* ECF No. 18.)

The Court agrees that Comerica may compel arbitration of El-Hage's claims as a nonsignatory to the Cardmember Agreement with Elan. As a matter of judicial efficiency, the Court will address that basis for arbitration rather than review each of El-Hage's objections to his separate contract with Comerica.

Nonparties to a contract are not "categorically barred" from relief under the FAA because "traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009) (citing 21 R. Lord, Williston on Contracts § 57:19 (4th ed. 2001)). Accordingly, whether a nonparty may enforce an arbitration agreement is a question of state law. *Id.* As discussed above, Ohio law governs the Cardmember Agreement between Elan and El-Hage. Ohio law enforces arbitration agreements against nonparties through each of those theories of liability: "assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel." *Boyd v. Archdiocese of Cincinnati*, No. 25950, 2015 WL 1600303, at *7 (Ohio 2015) (quoting *Arthur Andersen*, 556 U.S. at 631).

A nonsignatory can compel arbitration with a signatory to an arbitration agreement "because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract" and if "the claims were intimately founded in and intertwined with the underlying contract obligations." *Belmont Med. Care, LLC v. Cmty. Ins. Co.*, No. 2:18-CV-968, 2019 WL 1676003, at *4 (S.D. Ohio Apr. 17, 2019) (quoting *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995)); *see also*

*Reilly v. Meffe*, 6 F. Supp. 3d 760, 777 (S.D. Ohio 2014). Courts have described this theory as a species of estoppel. *See Belmont*, 2019 WL 1676003, at *4 (collecting cases).

Comerica may compel arbitration through the agreement between Elan and El-Hage based on this theory of liability. Comerica and Elan had a close relationship; they offered joint banking services that depended on each party's participation, including the Overdraft Protection service that forms the factual basis of El-Hage's claims in this action. Elan's Cardmember Agreement even names Comerica. It is titled "Comerica Bank Visa Platinum Card Agreement." And the facts and legal theories underlying El-Hage's claims against each defendant will overlap substantially. It would be duplicative, inefficient, and more costly, especially for El-Hage, to simultaneously arbitrate with Elan and litigate with Comerica.

The Court notes in closing that Michigan law would yield the same result. *See, e.g.*, *In re Auto. Parts Antitrust Litig*., No. 12-MD-02311, 2017 WL 3579753, at *3 (E.D. Mich. Apr. 18, 2017) (holding that equitable estoppel is appropriately applied where a nonsignatory "has a close relationship with one of the signatories and . . . the claims raised by the plaintiff are related to the agreement containing an arbitration clause"). So enforcing arbitration under the Cardmember Agreement is not an end-run around El-Hage's right to have Michigan law applied under the Comerica Deposit Account.

As discussed above, a valid agreement to arbitrate exists between El-Hage and Elan and their dispute falls within the substantive scope of that agreement. Comerica, although not a signatory, has a close relationship with Elan as joint service providers and El-Hage's claims against both Elan and Comerica are intimately intertwined with the underlying contract obligations. So Comerica is entitled to enforce the arbitration provision as a nonsignatory.

Dismissal without prejudice, rather than a stay pending arbitration, is proper here again because all of the issues raised against Comerica must be submitted to arbitration. *See Green v. Ameritech Corp.*, 200 F.3d 967, 973 (6th Cir. 2000).

### IV.  Conclusion

For the reasons given, the Court GRANTS Elan Financial's Motion to Dismiss and Compel Arbitration on an Individual Basis. (ECF No. 11.)

The Court further GRANTS Comerica's request to compel arbitration as a nonsignatory in its Response in Support of Elan Financial Services' Motion to Dismiss and Compel Arbitration (ECF No. 15.)

The Court DISMISSES AS MOOT Comerica's Motion to Dismiss and Compel Arbitration under the Deposit Account Contract. (ECF No. 13.)

Accordingly, this action is DISMISSED WITHOUT PREJUDICE.

SO ORDERED.

Dated: December 16, 2020

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE